FILED

11/15/2021

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 20, 2021 Session

# IN RE ADALINE D. ET AL.[1]

**Appeal from the Chancery Court for Cumberland County
No. 2019-CH-1665  Ronald Thurman, Chancellor**

_____

## No. E2020-01597-COA-R3-PT

_____

The maternal grandmother and step-grandfather of two children filed a petition to terminate the parental rights of the children's biological mother and of their respective alleged fathers on the grounds of abandonment by failure to provide financial support, abandonment by failure to visit, and failure to manifest an ability and willingness to assume legal and physical custody of the children. The petitioners also averred that the alleged fathers had failed to establish paternity of their respective child. The trial court granted the petition, finding that each of the alleged statutory grounds for termination had been established by clear and convincing evidence and that terminating the parental rights was in the children's best interests. Upon careful review of the record, we reverse the trial court's finding as to the ground of failure to manifest an ability and willingness to assume legal and physical custody of the children but affirm its judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed in Part; Reversed in Part; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Ryan T. Logue, Morristown, Tennessee, for the appellant, Kayla D.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Tyson N.

Ivy J. Gardner, Crossville, Tennessee, for the appellees, Richard R. and Carla R.

## OPINION

_____

[1]  It is this Court's policy to protect the identity of children in parental termination cases by initializing the last names of parties and witnesses, as appropriate. Meaning no disrespect, we refer to certain parties and witnesses in this case by their first names.

## FACTUAL AND PROCEDURAL BACKGROUND

Kayla D. ("Mother") gave birth to Adaline D. in August 2015 and to Lilah N. in March 2018. Tyson N. ("Tyson") is the alleged biological father of Lilah N.[2] Richard R. and Carla R. ("Petitioners") are married and are the children's step-grandfather and maternal grandmother, respectively. Petitioners first received custody of Adaline in November 2016 pursuant to an order from the Cumberland County Juvenile Court ("the juvenile court"), resulting from Mother's admitted use of illegal drugs. Two years later, in November 2018, Mother regained custody of Adaline. Lilah was about eight months old at the time, and the juvenile court found that Mother's "home is a proper placement for [Adaline] who should be reunited with her mother and sister." However, just a few days later, on November 28, 2018, Mother returned to Petitioners' home with both children, admitted to drug use, and called the Tennessee Department of Children's Services ("DCS") to make a referral on herself. DCS asked Petitioners to take in Mother and the children, and they stayed at Petitioners' home until early February 2019.

On February 13, 2019, Petitioners filed a petition for ex parte emergency custody of Adaline and Lilah in the juvenile court. The petition alleged that on November 28, 2018, nine days after regaining custody of Adaline, Mother admitted to relapse in using drugs and returned to live with Petitioners; that Mother became violent at Petitioners' home on February 12, 2019; that while attempting to leave with the children, Mother wrecked into Petitioners' truck; that the children were unrestrained in Mother's vehicle; that Mother was arrested and taken to jail; and that both Mother and Tyson were actively using illegal narcotics. On the same day, the juvenile court entered an ex parte order placing custody of the children with Petitioners.

On February 20, 2019, the juvenile court entered a preliminary hearing order finding probable cause for removing the children, leaving custody of the children with Petitioners, and mandating that all contact between the children and Mother and Tyson "be directly supervised" by Petitioners. The record contains no evidence of further proceedings in the juvenile court. Meanwhile, in May 2019, Mother pled guilty to reckless endangerment in the Cumberland County General Sessions Court with respect to the incident at Petitioners' home on February 12, 2019. She was sentenced to 11 months and 29 days in jail, but the sentence was "furloughed" to long-term treatment. Mother entered a twelve-month rehabilitation program on June 3, 2019.

On September 20, 2019, Petitioners filed a petition for termination of parental rights and adoption of the children in the Cumberland County Chancery Court ("the trial court"),

---

[2] Although Adaline's biological father was also named as a party in the underlying action, he is not a party to this appeal. He failed to appear and did not respond to the petition to terminate his parental rights, and the trial court entered a judgment by default against him after finding that Petitioners proved by clear and convincing evidence the grounds for termination alleged against him. He is not referenced further in this opinion.

alleging as grounds for termination that, during the relevant statutory period, Mother and Tyson did not support the children, did not visit the children, and failed to manifest an ability and willingness to assume legal and physical custody of the children. In addition, Petitioners alleged that Tyson's parental rights should be terminated for failure to file a petition to legitimate Lilah N. within thirty days after statutory notice of his alleged paternity, pursuant to Tennessee Code Annotated section 36-1-113(g)(9).

Trial was held on September 16 and 17, 2020. Petitioners introduced the testimony of several witnesses. Brandon Griffin, an officer with the Crossville Police Department, testified that he responded to a domestic incident between Mother and Tyson on May 27, 2019. According to Officer Griffin, Mother told him that she and Tyson had been arguing because Tyson did not want her to go into treatment. Tashua Stone, a Cumberland County Sheriff's deputy, testified that she arrested Mother on February 12, 2019, on charges of leaving the scene of an accident, reckless endangerment, and vandalism, after responding to the incident at Petitioners' home. Pam Cooper, a daycare worker, testified that she started taking care of the children since Adaline was eight or nine months old. Ms. Cooper said that Petitioners have been the ones primarily involved in the children's daily drop off and that she has never seen Tyson. She had seen Mother only a couple of times when Adaline was around nine months old. Taylor Hammons, the children's babysitter, testified that she has known Adaline since she was about one year old. Ms. Hammons has never met Tyson. She testified that on one occasion Mother did not pick up the children, and she had to keep them overnight and take them to Petitioners' home the next day. Dakota R., Mother's half-brother and the children's uncle, testified that he and Mother were "real close" growing up. Dakota said they had smoked marijuana together when they were in high school. He said he did not think Mother and the children had "really established" a relationship because Carla R. had Adaline since she was only months old. Dakota said that when he observed Mother with the children, Mother tried to be "motherly" but struggled. He added that whenever Adaline would have any type of "issue," she would go to Carla instead of Mother. Dakota was present during the February 2019 incident at Petitioners' home and saw Mother attempting to leave with Adaline in the front seat of her car and Lilah in the back seat, both unbuckled, and then hitting Petitioners' truck and house. Sydney R. is Dakota's wife. Sydney testified that Petitioners provide a safe environment for the children and added, "I leave my [two-year-old] son with them all of the time with the girls." She said that Mother had told her before that she used drugs whenever she feels "stressed or bored."

Petitioners also offered their own testimony. Carla R. testified that she and Richard R. have been married for nine years and that she has worked as a pharmacy technician for over eighteen years. Carla said that when Mother was six years old she learned that Mother's biological father—and her then husband—was a drug user and had exposed Mother to drugs. Carla said she immediately pursued legal action to remove his visitation rights. They were divorced six months later. She also said that when Mother was twenty-one years old, Mother told her for the first time that Mother's father had also sexually

abused her when she was six years old. Carla admitted that she and Mother do not get along. Concerning Mother's history of drug use, Carla learned that Mother was using drugs when Mother was seventeen years old and tested positive for opioids after passing out at a cross country meet. Mother has told her that she has used meth, marijuana, and IV drugs, and that her pill of choice is Opana.[3] According to Carla, Mother had unsuccessfully attempted rehabilitation four times, including detoxing in December 2017 when Mother was about six months pregnant with Lilah. Carla said that Mother "was trying to quit doing opioids. So Tyson introduced her to shooting up with Meth. It would take away the body ache of stopping pills." One time when Mother was hospitalized for liver failure, Mother told Carla that Tyson "sometimes . . . comes in here and so I don't feel the pain, he brings me some drugs."

Carla said Mother moved out when she turned eighteen. Mother came back to Petitioners' home when she was pregnant with Adaline and was still living there when Adaline was born. A few months after giving birth to Adaline, Mother started using drugs again with coworkers. Mother started going out and would leave Adaline with Petitioners. Mother moved out with Adaline in July 2016; however, Petitioners still cared for Adaline every day, except Sunday when Mother would keep her until Monday morning when she would take her to day care. Carla said that when Adaline had her tonsils removed, Mother knew about the procedure, was able to come, but did not show up. Petitioners received custody of Adaline in November 2016 after Mother told Carla that "she was using drugs and asked if [she] would take Adaline." Carla said that she did not hear from Mother from November 2016 to November 2018 and that Mother did not try to visit Adaline during that period. She explained that in November 2018, nine days after custody of Adaline had been returned to Mother, DCS showed up at her home with Mother, Adaline, and Lilah to ask if Petitioners could take Mother and the children in. "[Mother] would remain in custody of her own children, with us helping supervise. And she was to go to an outpatient treatment center at the hospital." Carla said Mother went to treatment a couple of times but then stopped going. In February 2019, when Mother took the children from Petitioner's home, Carla saw from the kitchen window that "Lilah was in the back and Adaline was standing up in the driver's seat and [Mother] was driving into our house and into my husband's vehicle." Both children were unrestrained. She said Petitioners received custody of both children the next day because Mother was arrested. They have provided the children with everything they need and have enrolled them in kindergarten and daycare.

Carla stated that neither Mother nor Tyson has given any type of support for the children during the four months preceding the filing of the petition to terminate their parental rights, but she acknowledged that Mother sent Adaline a birthday gift and Christmas gifts for both children. She added that Mother did not help support the children when Mother lived at Petitioners' home. Carla also stated that neither Mother nor Tyson

---

[3] "Opana is a very strong form of the narcotic oxymorphone and used to treat chronic pain." *State v. Irizzary*, No. M2016-00465-CCA-R3-CD, 2017 WL 1205960, at *3 (Tenn. Crim. App. Mar. 31, 2017).

attempted to contact her about the children, other than one time when Tyson asked for a birthday picture of Lilah. She said that her address has not changed since Mother lived in her home and that her mobile number has not changed in the last ten years. She stated that neither Mother nor Tyson made consistent attempts to see the children. Carla said she never told Mother or Tyson that they were not permitted to see the children but that she had instructed them: "Have your attorney contact our attorney."

Carla testified that she is extremely close with the children and that they do everything together. The children call her "Mimi," and they call Richard "Paw." She said that Adaline knows Mother only as "the lady from McDonald's," where they would have visitation. She stated that neither Mother nor Tyson has a bond with the children. According to Carla, Adaline gets scared when she hears Mother's name and says, "Don't talk to me about that." She said she is willing to take care of the children for the rest of her life, and the children have developed a bond with her husband as well.

Richard R. corroborated much of his wife's testimony. Richard said Adaline goes with him to feed the dogs and chickens and "follows [him] around everywhere." He said the children love Carla more than anything in the world. Richard has been in Mother's life for about ten years and, based on his experience as a former narcotics officer with the Crossville Police Department, has seen her "higher than a kite" before. He said that during the February 2019 incident, Mother "rammed" her car between his house and his truck after he refused to move his truck for her to leave because he could tell Mother was "high" on drugs. According to Richard, after Petitioners received emergency custody of the children, the only contact he had with Mother and Tyson was a text, to which he responded, "Have your attorney contact our attorney." He has not told them that they cannot visit the children. Richard also stated that Mother and Tyson have not provided any financial support for the children. Richard said that he and the children have developed a bond, and he expressed concern with returning the children to Mother and Tyson because the children would be going to an environment where there had been repeated drug use.

In addition to their own testimony, Mother and Tyson offered the testimony of two other witnesses. Paige Holdsclaw, program director at True Purpose Women's Home, explained that the program is a year-long residential treatment program for men and women suffering from addiction. The program provides parenting classes, counseling, and treatment; offers accountability; and helps participants find jobs. According to Ms. Holdsclaw, Mother detoxed before entering the program although she was not required to do so. Mother was not allowed contact with anyone outside the program during the program's first month, June 3 to July 3, 2019. Weekend passes can be obtained after ninety days, which allow for family members to take participants wherever they need to go; participants cannot drive themselves. After nine months, participants can come and go if they have been trustworthy. Ms. Holdsclaw said that Mother and Tyson got their own apartment at nine months but were still subject to random drug screens, were in contact with program staff daily, and were attending classes. Melanie Collier, a friend of Mother

and Tyson, testified that she went with Mother to the first supervised visit at McDonald's and that she "could see right away that [Mother] needed some support." According to Ms. Collier, Petitioners bought breakfast for Adaline, kept it at their table, and asked Adaline to come and get another bite. They also kept asking, "do you want to play with the cell phone?" In Ms. Collier's view, visits at the park were worse. "I think anybody would be intimidated if you had somebody just breathing down your neck when you're only trying to visit with your child." She added: "I noticed that whenever there was a visit, [Petitioners] deliberately kept referring to [Mother by her first name] . . . so that their granddaughter never got the idea that [Mother] Kayla was her mother." Ms. Collier testified that Mother would visit her in Crossville once a month.

Tyson, Adaline's alleged father, testified that he and Mother married in July 2019 and live together with their daughter, Aurora, who was born in September 2019. Aurora was born while he and Mother were participating in the True Purpose year-long treatment program. He asserted that Lilah is his daughter but admitted that he had not had a DNA test to establish his paternity. Tyson said that he was in county jail when Lilah was born but that he went to sign her birth certificate once he was released. He stayed home with Lilah for four months because Mother was working at the time. He then began working at Stonepeak Ceramics in Crossville more than sixty hours per week, making $11.50 per hour, until he entered the treatment program. He said he had to stop working and begin volunteering for the first three months but thereafter began working at Denso Manufacturing, where he is still employed. He makes about $50,000 per year working fifty to sixty hours per week. Tyson admitted that he understands his obligation to support his children even without a court order. He said he did not pay any child support to Petitioners because he has "been blocked from trying to support them."

Tyson testified that in July 2019, his terms of probation were modified to include completing the True Purpose treatment program. He stated that program participants are not allowed to have outside contact for the first six weeks but that he tried to contact Carla once he was permitted to make phone calls. Tyson insisted that he did not willfully fail to visit Lilah. Instead, he explained: "Well, seeing how the court [emergency custody] order stated that we're not to come within the vicinity of our children and would be restrained from being around the petitioners or the children, it's kind of hard for me just to show up to her house, first of all, if I knew where it was. Second of all, they won't respond to texts, calls, nothing. What am I supposed to do? Send a letter to them? I mean, I don't know." He said that he texted and called Richard multiple times to try to see Lilah. He said he asked for a picture of Lilah, but Carla did not send it. Tyson admitted that Petitioners never told him that he could not see Lilah and that he did not write any letters to her.

Tyson explained that he started using drugs "[e]ver since [he] got hurt in the Army" and admitted that he was using Oxycontin and Oxycodone at the time of the February 2019 court hearing when the children were placed with Petitioners. He said, however, that he passed all random drug screenings given during the treatment program and that he has been

clean almost sixteen months. Concerning Mother's relapse in November 2018, which led to Mother and the children going to Petitioners' home, he stated that he and Mother "had a moment of weakness." After that time, he saw Lilah once during Christmas and another time when they went out to eat.

Tyson did not have concerns about the children's safety when staying with Petitioners. He stated that he submitted to a court-ordered hair follicle test but that he does not know the results. After initially stating that the children's guardian ad litem never communicated with him, when pressed about receiving a business card from her at the February 2019 hearing, he said: "If that was on the day of the hearing, that was the only contact that we were out here." He admitted he never reached out to the guardian ad litem. Tyson acknowledged that he has an eight-year-old daughter in Ohio whom he has not seen for over a year and for whom he does not pay child support.

Mother testified that she did not have custody of Adaline when her second child, Lilah, was born. She said she was a month or two pregnant with Lilah when she entered a detox program. However, she later admitted that she was "further along than just barely pregnant" when she went for detox. Her youngest child, Aurora, was born in September 2019 while Mother was enrolled in the year-long treatment program. Mother admitted she was using drugs during the pregnancy.

Mother stated that she was first exposed to drugs when she was sexually abused and "forced with drugs at six years old" by her biological father. She said she started using "hard core" drugs when she was eighteen years old, including "Roxies, Opanas, Percs, [and] Hydros." She dropped out during her first semester of college due to "struggling with addiction." Over the years, she has also used meth, L.S.D., marijuana, and cocaine. Mother acknowledged using drugs with Tyson. She does not recall saying to Carla that Tyson "came and shot [her] up with Meth because [she was] pill sick in the hospital." Mother has been in treatment programs three times, the last one being the only long-term treatment she has had. She admitted that her last treatment was court-ordered and that she would have to serve her sentence in confinement if she left the program. Mother started the treatment program on June 3, 2019 and completed it on June 3, 2020. She said she was five or six months pregnant with Aurora when she started the program. Mother did a six-week parenting class during the fourth month of the program. She also had trauma counseling with a clinical counselor every day during the program. Mother gets a Vivitrol shot once a month, which prevents a person from getting high from opiates. While Mother was pregnant with Aurora, she took Naltrexone, which is the pill form of Vivitrol.

With respect to visitation of the children, Mother said that for the first thirty days of the treatment program, she was not allowed to have contact with anybody or leave the facility. She stated that prior to entering the program, she was "going back and forth to court. And [she] couldn't do anything until [her] court cases were settled." Mother stated that she had "been texting and calling after the court date and . . . they kept saying, 'Have

- 7 -

your attorney contact our attorney.'" Once she began getting "one or two phone calls a week for five to ten minutes," Mother called Carla "at work and she hung up on me." She said she used the program director's cell phone to text Carla and check on the children while in the program. After the program ended, she said she texted Carla and still received no response. Mother stated: "I have tried so much to reach out to them and I get ignored. I've sent presents. I've tried to do everything. I don't even know if that's their correct address. I have tried to see how my kids are and nobody responds back to me, so how can I move forward or try to set any visitations if no one will respond back." She claimed that she does not know Petitioners' home address or Richard's cell phone number. She admitted the Petitioners have not "directly" told her that she cannot visit the children but maintained that they will not take her calls. Mother said she "wrote a Christmas letter in the Bible books that [she] sent [to the children]." Mother said she "didn't know what to do. You know, I'm sitting here screaming, like 'Let's do something, please.' And I'm getting no response back. You know, I was stuck in a really hard place that felt I had no options."

Concerning support of the children, Mother said that she worked at a restaurant for about a year, making two to three hundred dollars per week. She also worked forty hours per week at Good Samaritans for about a year making about $8 per hour and as as a janitor at Life Care Center making $11-12 per hour. More recently, Mother had cleaned houses once or twice a month, making about $50 per month. She said that during the treatment program she did not have the means to send support because she was required to volunteer her time. She confirmed she has never paid child support but affirmed she would be willing if Petitioners would respond to her. She said she did not send support because she did not know where to send it.

Regarding the incident at Petitioners' home in February 2019, Mother said she pled guilty to the charges "so [she] wouldn't have a felony charge." She said that she has "been high around [the kids], but . . . never actually got high around them." Mother admitted to speaking with the guardian ad litem at the emergency custody hearing in February 2019. She said that the guardian ad litem never contacted her and that she never contacted the guardian ad litem. Mother stated that she has been at her current address since March 2020, paying rent, utilities, and a car loan. The children have private health insurance with Blue Cross/Blue Shield through Tyson. Mother asserted that she is "in a way different place now mentally, emotionally, physically, spiritually. . . . I've completely changed my life. The way I live, the way I think and the way that I'm a mom. It's completely changed everything." She highlighted that she and Tyson "have a one year old that is thriving. She is very well taken care of. And she wants to see her sisters." Mother has had no encounters with law enforcement since the February 2019 incident. She has a driver's license and a cell phone, and she is willing to get a job right away although she currently stays at home.

On November 2, 2020, the trial court entered an order terminating Mother's and Tyson's parental rights, concluding that Petitioners had proven by clear and convincing

evidence three grounds for termination against both Mother and Tyson: abandonment by willful and voluntary failure to support the children during the statutory four-month period preceding the filing of the termination petition (May 20, 2019 through September 19, 2019), abandonment by willful and voluntary failure to visit the children during the statutory period, and failure to manifest an ability and willingness to assume legal and physical custody of the children. The trial court also ruled that Tyson is not the legal father of Lilah because of his failure to meet statutory requirements and "by not being married to [Mother] at or within three hundred days of the child's birth, failing to get a D.N.A. test or obtain a court order of paternity." In addition, the trial court determined that it was in the children's best interest to terminate Mother's and Tyson's respective parental rights. The trial court noted that it was concerned about "removing the [children] from their present environment and placing them somewhere else where there's some question."

## ISSUES PRESENTED

The appellants raise the following four issues on appeal:[4]

1. Whether the trial court erred in finding by clear and convincing evidence that appellants abandoned the children by failing to visit them.

2. Whether the trial court erred in finding by clear and convincing evidence that appellants abandoned the children by failing to make child support payments.

3. Whether the trial court erred in finding by clear and convincing evidence that appellants failed to manifest an ability and willingness to assume legal and physical custody or financial responsibility of the children and that placing the children in their legal and physical custody would pose a risk of substantial harm to the physical and psychological welfare of the children.

4. Whether the trial court erred in finding by clear and convincing evidence that termination of their parental rights was in the children's best interest.

In addition, Tyson asks this Court to review:

5. Whether the trial court erred in finding by clear and convincing evidence that he failed to file a petition to establish paternity to Lilah N.

## STANDARD OF REVIEW

Our Supreme Court has explained that:

---

[4] As to appellant Tyson, these issues apply only to Lilah N.

- 9 -

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016). Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013); *see also* Tenn. Code Ann. § 36-1-113(g). "A party seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *Id.* (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of erroneous governmental interference with fundamental parental rights[,]" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.,* 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own

determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.,* 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523–24.

We give considerable deference to a trial court's findings about witness credibility and the weight of oral testimony, as the trial court had the opportunity to see and hear the witnesses. *State Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006). Where an issue "hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings." *Id.* (citing *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990)); *see also Franklin Cnty. Bd. of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) ("If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary.").

## DISCUSSION

In order to terminate parental rights, a trial court must find by clear and convincing evidence that: (1) statutory grounds for termination of parental and guardianship rights have been established, and (2) termination is in the best interests of the child. *See* Tenn. Code Ann. § 36-1-113(c). We begin our analysis by reviewing whether the proof presented at trial constitutes clear and convincing evidence of each ground for termination listed in the trial court's Final Order.

## I. Grounds for Termination

Tennessee Code Annotated section 36-1-113(g) provides that abandonment, as defined in section 36-1-102, is a ground for terminating parental rights. Tenn. Code Ann. § 36-1-113(g)(1) (2017 & Supp. 2019). Section 36-1-102 provides, in relevant part, that abandonment occurs, among other instances, when

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the

child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child.

*Id.* § 36-1-102(1)(A)(i). Here, Petitioners filed their petition for termination of parental rights and adoption of the children on September 20, 2019. The record supports the trial court's finding that the relevant four-month period for a finding of abandonment ran from May 20, 2019 through September 19, 2019. We review accordingly.

## A. Abandonment – Willful Failure to Visit

One form of abandonment is failure to visit, which occurs when a parent, "for a period of four (4) consecutive months, [fails] to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" is "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(1)(C). A parent may assert the absence of willfulness, which must be proved by a preponderance of the evidence, as an affirmative defense to abandonment by failure to visit. *Id.* § 36-1-102(1)(I). This Court has explained:

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.

*In re Audrey S.*, 182 S.W.3d at 864 (citations omitted); *see also In re Adoption of Angela E.*, 402 S.W.3d at 640 ("A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control.").

Here, the trial court found by clear and convincing evidence that Mother and Tyson willfully failed to visit the children "for a period exceeding" the four-month statutory period. The record supports this finding. On February 13, 2019, the juvenile court issued a custody order placing Adaline and Lilah with Petitioners, following Mother's arrest for her actions at Petitioners' home the day before. Richard testified that after he and Carla received custody of the children, the only contact he had with Mother and Tyson was one text to which he responded, "Have your attorney contact our attorney." Carla said that Tyson asked for a birthday picture of Lilah once, that her address has not changed since Mother lived with them, and that her mobile number has not changed in the last ten years.

- 12 -

She corroborated Richard's testimony that they had never told Mother or Tyson that they could not see the children but rather instructed them to have their attorney contact Petitioners' attorney. The trial court credited Richard and Carla's testimony.

Mother and Tyson do not dispute their failure to visit the children during the statutory period; rather, they argue that such failure was not willful. They both point to the treatment program's requirement that they have no contact with anyone outside the program for the initial thirty days. As the trial court did, we find that such requirement does not excuse their failure to visit the children during the relevant statutory period. First, Mother and Tyson did not visit the children before starting the treatment program in June 2019. Both acknowledged that they were aware of their duty to visit the children, that the juvenile court's order allowed visitation, and that Petitioners never said they could not see the children. Second, Mother and Tyson did not pursue visits with the children once allowed to do so during the treatment program. Ms. Holdsclaw, the program's director, testified that after completing the program's first ninety days, participants can obtain forty-eight-hour weekend passes that allow family members to take participants wherever they need to go. Mother and Tyson did not avail themselves of this option to visit the children. Third, Mother and Tyson did not attempt to stay in contact with the children through available alternative means, such as mailing cards or letters to the children. *See In re Gavin G.*, No. M2014-01657-COA-R3-PT, 2015 WL 3882841, at *7 (Tenn. Ct. App. June 23, 2015) (finding that father residing at a sober living facility had the capacity to remain in contact with his son by sending letters or cards).

In addition, Mother argues that during her participation in the treatment program, she was "texting and calling [Petitioners] . . . and . . . they kept saying, 'Have your attorney contact our attorney.'" The record shows conclusively that Mother's earliest texts to Petitioners are dated September 26, 2019—the day *after* she was served with the petition to terminate her parental rights and well beyond the relevant statutory period. Tyson also asserts that Petitioners did not respond to texts or calls. Despite their allegations that Petitioners "blocked" them from seeing the children, Mother and Tyson admitted they knew they could petition the juvenile court to "enforce their right to visit" the children, but they did not seek the court's assistance. *Id.*[5] We find this argument unavailing to establish that their failure to visit the children resulted from circumstances outside of their control. *See In re Adoption of Angela E.*, 402 S.W.3d at 640.

Against this backdrop, we find that Mother and Tyson have "no justifiable excuse" for their failure to visit the children during the relevant statutory period. *See In re Audrey S.*, 182 S.W.3d at 864. Finding nothing in the record to the contrary, we also defer to the

---

[5] While parents are under no requirement to seek court assistance to enforce visitation rights, taking legal action to enforce those rights can preclude a finding of willfulness. *In re Gavin G.*, 2015 WL 3882841, at *7 (citing *In re Joseph D.N.*, No. M2009–01353–COA–R3–PT, 2010 WL 744415, at *4 (Tenn. Ct. App. Mar. 3, 2010); *In re M.L.P.*, No. W2007–01278–COA–R3–PT, 2008 WL 933086, at *11 (Tenn. Ct. App. Apr. 8, 2008); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)).

trial court's specific finding that the testimony of Petitioners was credible while that of Mother and Tyson was questionable at best. *See T.M.B.K.*, 197 S.W.3d at 288 (stating that "the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings"). We thus affirm the trial court's finding that this ground was proven as to both Mother and Tyson by clear and convincing evidence.

### B.      Abandonment – Willful Failure to Support

Another form of abandonment is failure to support, which occurs when a parent, "for a period of four (4) consecutive months, [fails] to provide monetary support or . . . more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Support is considered "token" when "the support, under the circumstances of the individual case, is insignificant given the parent's means." *Id.* § 36-1-102(1)(B). An adult parent is presumed to know that he or she has a duty to provide support. *Id.* § 36-1-102(1)(H); *In re Braxton M.*, 531 S.W.3d 708, 724 (Tenn. Ct. App. 2017). A parent may assert, as an affirmative defense, that the failure to provide financial support was not willful. Tenn. Code Ann. § 36-1-102(1)(I). However, the parent bears "'the burden of proof that the failure to . . . support was not willful' and must establish the lack of willfulness by a preponderance of the evidence." *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *8 (Tenn. Ct. App. July 22, 2020) (quoting Tenn. Code Ann. § 36-1-102(1)(I)).

The trial court ruled that this ground for termination was established by clear and convincing evidence. Both Mother and Tyson admitted that they did not provide financial support for the children during the relevant statutory period despite knowing they had an obligation to so do even without a court order. Indeed, they did not provide support for the children at any point before entering the treatment program. Both described their history of full-time employment before *and* during some of the statutory period. Petitioners testified that the only support the children received from Mother and Tyson were birthday and Christmas presents in 2019, which would constitute, at best, token support—and the Christmas presents were given *after* the petition for termination was filed.

Tyson sought to justify his failure to provide monetary support for Lilah by asserting that Petitioners blocked him from so doing, while Mother said she did not provide financial support because she did not know where to send it. Given that Mother returned to live at Petitioners' home in November 2018 and left just three months before the beginning of the statutory period—in February 2019—as well as her and Tyson's ability to send birthday and Christmas presents for the children at Petitioners' home that same year, we agree with the trial court that these assertions are not credible. Nor do we find Mother's and Tyson's participation in the court-mandated treatment program a justification for their failure to provide support for the children. It is not as if their support was suddenly interrupted when

- 14 -

they entered the program; they had never provided support. The record supports the trial court's ruling that this ground was established by clear and convincing evidence.

### C. Failure to Manifest an Ability and Willingness to Assume Custody

Tennessee Code Annotated section 36-1-113(g)(14) also provides a ground for termination of parental rights when

> [a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires clear and convincing proof of two elements. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. Tenn. Code Ann. § 36-1-113(g)(14). The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* Our Supreme Court recently held that the statute requires "a parent to manifest both an ability and willingness" to personally assume legal and physical custody or financial responsibility for the child. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citing *In re Amynn K.*, 2018 WL 3058280, at *13). Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.*

In finding that this ground was established by clear and convincing evidence, the trial court focused its analysis solely on Mother's and Tyson's failure to take any steps in the juvenile court to regain custody of the children. Mother and Tyson argue that the trial court made no findings as to the second element of this ground; that is, that placing the children in their custody would pose a risk of substantial harm to the children's physical or psychological welfare. We agree. The trial court's order is devoid of any reference to the substantial harm element of the statute. "'It is well-settled that a trial court speaks through its written orders—not through oral statements contained in the transcripts—and that the appellate court reviews the trial court's written orders.'" *Williams v. City of Burns*, 465 S.W.3d 96, 119 (Tenn. 2015) (quoting *Anil Constr. Inc. v. McCollum*, No. W2013–01447–COA–R3–CV, 2014 WL 3928726, at *8 (Tenn. Ct. App. Aug. 7, 2014)). This Court is thus unable to determine whether the trial court considered this element in reaching its conclusion.[6] Accordingly, we reverse the trial court's finding that this ground for termination was established by clear and convincing evidence.

---

[6] The trial court's order does not incorporate its oral ruling.

The parental rights of a putative father may be terminated for failure to visit, failure to provide child support, and failure to manifest an ability and willingness to assume legal and physical custody of the child. Tenn. Code Ann. § 36-1-113(g)(9)(A)(ii)-(iv). A putative father's failure to file a petition to establish paternity of the child within thirty days after notice of alleged paternity also constitutes a ground for termination of his parental rights. *Id.* § 36-1-113(g)(9)(A)(vi). Tyson meets the statutory criteria for Lilah because he is listed as her father on her birth certificate. *See id.* §§ 36-1-102, 117(c)(4) (providing that a putative father includes "a biological or alleged biological father of a child who, at the time of the filing of the petition to terminate the parental rights of such person," had not been excluded by a DNA test and "is recorded on the child's birth certificate as the father of the child").

The trial court determined that Tyson failed to establish paternity of Lilah "by failing to meet the requirements of T.C.A. § 36-1-102 (28)[7] and T.C.A. § 36-1-113 (G)(9)(B) by not being married to [Mother] at or within three hundred days of the child's birth, failing to get a D.N.A. test or obtain a court order of paternity." Section 36-1-102(28), in relevant part, defines "legal parent" as

> [a] man who is or has been married to the biological mother of the child if the child was born during the marriage or within three hundred (300) days after the marriage was terminated for any reason, or if the child was born after a decree of separation was entered by a court[.]

Tenn. Code Ann. § 36-1-102(28)(A)(ii). In addition, the statute states:

> A man shall *not* be a legal parent of a child based solely on blood, genetic, or DNA testing determining that he is the biological parent of the child *without* either a court order or voluntary acknowledgement of paternity pursuant to § 24-7-113. Such test may provide a basis for an order establishing paternity by a court of competent jurisdiction, pursuant to the requirements of § 24-7-112[.]

*Id.* § 36-1-102(28)(B) (emphases added). Section 36-1-113(g)(9)(B) provides that the notice of alleged paternity required for termination of a putative father's parental rights for failure to establish paternity, *see id.* § 36-1-113(g)(9)(A), may be given at any time after

---

[7] The version of section 36-1-102(28) in effect at the time Petitioners filed their petition for termination of parental rights and adoption provides the definition for "Interstate Compact on the Placement of Children (ICPC)." We presume that the trial court intended to cite the immediately preceding version of the statute, which defines the term "[l]egal parent." *See* Tenn. Code Ann. § 36-1-102(28) (Supp. 2018). That definition did not change when then the statute was later renumbered to section 36-1-102(29).

the child's conception and may include actual notice of a petition to terminate the putative father's parental rights. *Id.* § 36-1-113(g)(9)(B).

Here, it is undisputed that Tyson received the required notice for termination of his parental rights, as Lilah's putative father. By his own testimony, he held himself out as Lilah's father, signed her birth certificate, and cared for her for several months early in her life; he also was served with a petition for termination alleging his paternity. In addition, the record makes clear that he was not married to Mother at the time of Lilah's birth or within 300 days. Tyson testified that he neither obtained a D.N.A. test nor sought a court order to establish his paternity, as statutorily provided.

The gist of Tyson's argument on appeal is that the trial court "failed to look at those factors that go beyond mere appearance and fill in documents." In essence, he asserts—without citation to legal authority—that the trial court should have disregarded the statutory requirements established by the legislature for establishing paternity and, instead, deemed sufficient the fact that the parties did not dispute that he held himself out as Lilah's father. We disagree. Courts are not at liberty to disregard the clear mandates of a statute. *See Ken Smith Auto Parts v. Thomas*, No. E2018-00928-COA-R3-CV, 2019 WL 192442, at *6 (Tenn. Ct. App. Jan. 15, 2019) (quoting *Browning v. Browning*, No. E2017-02354-COA-R3-CV, 2018 WL 4057245, at *3 n.3 (Tenn. Ct. App. Aug. 27, 2018)). We thus find no error in the trial court's conclusion that Tyson failed to establish paternity of Lilah and, therefore, is not her legal father.

## II.     Best Interests of the Children

In addition to proving at least one statutory ground for termination, a party seeking to terminate a parent's rights must prove by clear and convincing evidence that termination is in the child's best interests. *See* Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004)). Rather, our termination statutes recognize that "not all parental conduct is irredeemable[,]" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interests analysis is not the parent but the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interest must be viewed from the child's, rather than the parent's, perspective.").

Tennessee Code Annotated section 36-1-113(i) provides the following nine factors for analyzing best interests:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).[8] This list is non-exhaustive. *In re Marr*, 194 S.W.3d at 499. "Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Id.* "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing

---

[8] The legislature recently amended section 36-1-113(i). *See* Tenn. Code Ann. § 36-1-113(i) (2021). We, however, apply the version of the statute in effect at the time the petition for termination of parental rights and adoption of the children was filed in this case.

*In re Audrey S.*, 182 S.W.3d at 877).

The trial court found, and we agree, that both Mother and Tyson have "made a remarkable improvement" in their situation, considering their history of drug use. *See* Tenn. Code Ann. § 36-1-113(i)(1). There is no evidence in the record that they have used drugs since their participation in the True Purpose long-term treatment program. The proof is that they are raising their youngest child, Aurora, in a stable environment with Mother currently staying home and Tyson gainfully employed. This factor weighs against terminating their parental rights.

As addressed above, the record supports the trial court's finding that both Mother and Tyson have failed to maintain regular contact or other visitation with the children. *See id.* § 36-1-113(i)(3). The record also establishes that neither Mother nor Tyson has ever paid any child support for the children, let alone consistently. *See id.* § 36-1-113(i)(9). Likewise, the record supports the trial court's conclusion that Mother has not built a meaningful relationship with the children because Adaline has been in the care of Petitioners since birth and Lilah was not in Mother's care during "any cognitive time period." *See id.* § 36-1-113(i)(4). As to Tyson, although the testimony establishes that he cared for Lilah for a few months early in her life, we agree with the trial court that no meaningful relationship developed during a cognitive time period. These two factors weigh in favor of termination.

While acknowledging that the testimony shows that both Mother and Tyson had made positive life changes by the time of trial, the trial court expressed concern about placing the children "in a strange home where there is question as to their parents' sobriety." *See id.* § 36-1-113(i)(5). The best interests analysis focuses on the well-being of the child, not the parents' progress. Mother and Tyson's pattern or drug use and relapse, prior to their participation in the long-term treatment program, and the lack of a meaningful relationship with the children create a legitimate concern about removing the children from the only stable environment they have known most of their lives. This factor also weighs in favor of termination.

The record shows that Mother admitted to using drugs while pregnant with both Lilah and Aurora[9] and, therefore, committed physical abuse of the children. *See id.* § 36-1-113(i)(6). In addition, she pled guilty to endangering the children by attempting to leave Petitioners' home in a car with the children unrestrained. Several witnesses confirmed that the children were unbuckled as Mother rammed the car between Petitioners' home and truck. These facts apply to Tyson as well because he and Mother reside together. We

---

[9] This Court has repeatedly deemed a mother's drug use during pregnancy a form of severe child abuse. *See In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *8 (Tenn. Ct. App. Oct. 29, 2018) (compiling cases).

- 19 -

agree with the trial court that this factor favors termination.

The trial court stated that there was no proof presented as to whether Mother and Tyson's home provides a healthy and safe physical environment. *See id.* § 36-1-113(i)(7). Yet, the trial court concluded that this factor favors Petitioners. We disagree. While testimony in the record establishes that Petitioners' home is healthy and safe for the children, the record contains testimony and exhibits tending to show that Mother and Tyson's home also provides a healthy and safe environment. During Mother's testimony, her counsel introduced into evidence multiple photographs of the apartment in which Mother and Tyson have resided with Aurora. The photographs show a modest, but clean and well-maintained home. As the trial court recognized, there was no evidence offered to the contrary. We conclude that this factor weighs against termination.

After careful review, we conclude the trial court correctly found that the factors in Section 36-1-113(i)[10] collectively weigh in favor of termination. Although we commend both Mother and Tyson for the adjustments to their conduct and conditions following their participation in the long-term treatment program—which we hope will continue moving forward—we find that these efforts have come too late. *See In re Isabella G.*, No. M2016-02105-COA-R3-PT, 2017 WL 4407816, at *10 (Tenn. Ct. App. Oct. 3, 2017); *In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003). Mother's and Tyson's unjustified failure to pursue visitation of the children and to ever provide them with financial support severely hampers their arguments against termination of their parental rights. The resulting lack of a meaningful, stable relationship between them and the children is even more compelling, and it stands in stark contrast to the close relationship the children enjoy with Petitioners in the only stable home they have ever known. The statutory factors support the trial court's conclusion by clear and convincing evidence that terminating Mother's and Tyson's parental rights is in the children's best interests. We affirm.

## CONCLUSION

We affirm in part and reverse in part the judgment of the Cumberland County Chancery Court. Costs of this appeal shall be taxed equally to the Appellants, Kayla D. and Tyson N., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE

---

[10] We agree with the trial court that the requirement of reasonable efforts by social services agencies, *see id.* § 36-1-113(i)(2), is inapplicable here and that no evidence was introduced to show that any party's mental and/or emotional status at the time of trial would prevent them from providing the children with safe and stable care and supervision, *see id.* § 36-1-113(i)(8).